IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| RICHARD J. WICKHAM, Derivatively on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD M. OSBORNE, THOMAS J. SMITH, WILBUR EUGENE ARGO, MICHAEL T. VICTOR, GREGORY OSBORNE, WADE F. BROOKSBY, JOHN MALE, and RICHARD K. GREAVES,<br><br>Defendants,<br><br>-and-<br><br>GAS NATURAL, INC.<br><br>Nominal Defendant. | Civil Action No. 1:13-cv-2718<br><br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Richard J. Wickham ("Plaintiff"), by and through his attorneys, brings this action derivatively on behalf of nominal defendant Gas Natural, Inc. ("EGAS" or the "Company"). The allegations in this complaint are made upon personal knowledge with regard to Plaintiff's own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based upon, *inter alia*, his counsel's investigation, which includes without limitation, review and analysis of: (a) regulatory filings made by EGAS with the Securities and Exchange Commission ("SEC"); (b) interviews with former employees of the Company; (c) review of a limited number of internal EGAS documents; (d) regulatory filings made by EGAS and/or its subsidiaries with the Public Utilities Commission of Ohio ("PUCO"); (e) reports, testimony, and other materials from PUCO audits of the Company's Ohio operations

in 2010 and 2012; and (f) news reports, press releases, and other publicly available information regarding the Company.  Based on the allegations in this complaint, Plaintiff asserts individual claims for, among others, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder, breach of fiduciary duties and derivative claims for unjust enrichment against the members of the Company's board of directors (the "Board") and certain EGAS executives during the period commencing on or about January 1, 2007 through the current date (the "Relevant Period").

## **INTRODUCTION**

1.      This shareholder derivative action is brought on behalf of EGAS, an Ohio corporation, seeking relief against the members of the Company's Board to remedy their breaches of fiduciary duty and wholesale dereliction of their duties.  Rather than meet their obligations to ensure that EGAS operates in compliance with state regulatory requirements, for more than five years, the Board – which includes, Defendants Richard Osborne (Chairman of the Board and also EGAS's Chief Executive Officer ("CEO")), Thomas J. Smith (EGAS's Chief Financial Officer ("CFO")), Wilbur Eugene ("W.E.")) Argo, Michael T. Victor, Gregory Osborne, Wade F. Brooksby, John Male, and Richard K. Greaves (collectively, "Defendants" or the "Individual Defendants") – has caused and/or permitted EGAS to engage in a flagrant scheme for the financial benefit of Defendant Richard Osborne ("R. Osborne").  The other members of the Board, who are beholden to Defendant R. Osborne, have stood by idly and utterly failed in their oversight responsibilities with respect to ensuring the integrity of EGAS's operations, financial statements, reporting processes, and internal controls.

2.      EGAS is a natural gas company, primarily operating local distribution companies in seven states and serving approximately 74,000 customers.  The Company's revenue from

natural gas operations are generated under tariffs regulated by each state. In many states, including all of EGAS's service territories, the tariff rates of natural gas utilities are generally established to allow the utility to earn revenue sufficient to recover operating and maintenance costs, plus profits in amounts equal to a reasonable rate of return on their "rate base." A gas utility's rate base generally includes the utility's original cost, cost of inventory and an allowance for working capital, less accumulated depreciation of installed used and useful gas pipeline and other gas distribution or transmission facilities.

3.      Two of the Company's relevant natural gas utility subsidiaries are Orwell Natural Gas ("Orwell") and Northeast Ohio Natural Gas ("Northeast" or "NEO"), which operate in Ohio. The Company's Ohio operations are regulated by the Public Utilities Commission of Ohio ("PUCO").  PUCO regulates suppliers of natural gas ensuring Ohio consumers have access to adequate, safe, and reliable public utility services at a fair price.

4.      During the Relevant Period, Defendants have caused and/or allowed the Company and its Ohio subsidiaries to operate in violation of Ohio regulations for the financial benefit of Defendant Richard M. Osborne ("R. Osborne"), Chairmen and CEO of the Company, and certain related entities under his control.  In 2010, PUCO's staff performed an audit of Northeast, Orwell and certain of their subsidiaries (the "2010 Audit").  The 2010 Audit found that EGAS' Ohio subsidiaries had a practice of paying higher than normal prices for natural gas from related parties controlled by Defendant Osborne, most notably John D. Oil and Gas Marketing ("JDOG") and then passing along the inflated cost to regulated utility customers.  The 2010 Audit culminated in the Company entering into a stipulation with PUCO (the "2011 Stipulation")

requiring the Company, among other things, to end its practice of overcharging Ohioans and commence a competitive bidding process for natural gas supply by November 2011.[1]

5.      Nevertheless, Defendants have caused the Company and its subsidiaries to blatantly disregard their obligations under the 2011 Stipulation.  When PUCO performed a renewed audit in 2012 (the "2012 Audit") it culminated in an Opinion and Order being issued by PUCO in November 2013 (the "2013 Order")[2] admonishing the Company and its subsidiaries for flouting the 2011 stipulation and recommending an investigation of EGAS.  For example, instead of terminating its supply contract with an affiliated company and initiating a competitive process for purchasing local gas, the Company had instead rigged the natural gas purchase process to allow an EGAS affiliated company, JDOG, to win the contract.  JDOG then systematically overpaid for natural gas purchases resulting in premium payments due to JDOG at utility customers' expense.[3] According to a confidential witness, instead of creating a competitive bidding process and implementing proper systems controls the Company merely put in place cosmetic measures designed to mask the fact that practices had not changed.

6.      The 2013 Order further found that EGAS was charging its customers a processing fee, paid to an affiliated company controlled by Defendant R. Osborne, Cobra Pipeline Limited ("Cobra"), for gas that was never actually processed, and when an EGAS employee attempted to verify that the charged volumes were actually processed she was terminated.  The findings contained in the 2013 Order, as one commentator observed, are "shocking" and "read like a

---

[1] A copy of the 2011 Stipulation is attached hereto as Exhibit A.
[2] A copy of the 2013 Order is attached hereto as Exhibit B.
[3] Notably, Defendant Richard Osborne is the Chairman of the Board and Chief Executive Officer of JDOG, Defendant Thomas J. Smith is a director of JDOG and Defendant Gregory Osborne was president and chief operating officer and a director of JDOG until January 2012.

piece from Muddy Waters or Citron Research; it is not what one would expect from the normally conservative Public Utilities Commission of Ohio."[4]

7.     The Company's complete disregard for its obligations under the 2011 Stipulation was confirmed by a former employee of the Company ("WHISTLEBLOWER 1").[5]  Instead of creating a competitive bidding process and implementing proper systems controls, WHISTLEBLOWER 1 indicated that EGAS merely put in place cosmetic measures designed to mask that practices had not changed.  WHISTLEBLOWER 1 said that "nothing really changed between the audits" and that after the 2011 Stipulation, "documentation was merely there to give the appearance of compliance."   According WHISTLEBLOWER 1, the purchase of gas commodities from Defendant R. Osborne's privately controlled entities was routine even when gas could be purchased elsewhere at a discounted price.

8.     The Board has acquiesced to Defendant R. Osborne and his self dealing, even permitting the issuance of false and misleading financial statements that did not accurately portray these self dealing transactions between the Company and the private entities controlled by Defendant R. Osborne.  For example, according to WHISTLEBLOWER 1, in connection with the Company's financial audit for 2012 fiscal year end, the Company's purported independent auditor (ParenteBeard LLC) raised an issue with respect to hundreds of thousands of dollars of outstanding receivables owed to the Company by private companies controlled by Defendant R. Osborne.[6]  The audit committee, which is customarily charged with discussing

---

[4] Muddy Waters and Citron Research are investment research entities that focus on investigating corporate fraud/misconduct and advising the market to short sell when any such fraud is suspected.  These firms have exposed some of the more notable instances of corporate fraud and misconduct in recent history.

[5] Whistleblower 1 was employed at the Company from 2011 until mid 2013.  Whistleblower 1 reported to the Company's controller.

[6] As these receivables had been outstanding for quite some time, the auditor indicated that, unless EGAS received payment, the receivables would have to be written off and the Company could no longer recognize revenue on transactions with these entities because the revenue recognition requirement that payment be reasonably assured could not be satisfied.

issues raised by the auditors in connection with the audit, permitted the Company to effectively forgive these amounts via adjusting journal entries designed to basically manufacture payment. According to WHISTLEBLOWER 1, Defendant R. Osborne and the Company orchestrated a scheme whereby Northeast and Orwell wired money to EGAS's Montana subsidiaries, Northeast and Orwell were then issued credit memos by Defendant R. Osborne's private companies, and then EGAS went to great lengths to find ways it could claim that it had previously overpaid these private entities.  The credit memos were essentially a cover for forgiving the receivables.

9.      The systematic overcharging of utility customers, complete disregard for the 2011 Stipulation, and the related party transactions to the benefit of Defendant R. Osborne, are all the result of the Company's lack of effective internal controls.  Over the past eight years it has had at least four different controllers.[7]  WHISTLEBLOWER 1 stated that at least one of the Company's controllers and an assistant controller were terminated after raising concerns about the related party transactions at the Company.  The 2013 Order highlighted the Company's massive failures with respect to internal controls:

> The evidence shows that there is a severe organizational dysfunction within the companies and between the regulated companies and their non-regulated affiliates…
>
> Staff recommended that the Commission order an investigation into the management practices of the companies. Staff urged the Commission to not only inquire into the companies, but to include their related and affiliated regulated companies, as well. Staff emphasized that this is, in fact, an unprecedented recommendation; however, it comes following a series of extremely frustrating audits of the companies, rife with self-dealing that demonstrates a remarkable lack of control.

10.      These overarching failures at the Company have resulted from its lack of an independent board of directors to oversee the implementation of effective management practices.

---

[7] According to a November 22, 2013 Seeking Alpha article, the Company's CFO typically works from home and is only physically in the office one day per month.

Instead, the Company is dominated and controlled by its CEO and Chairman, Defendant R. Osborne.  The Board has capitulated to allowing Defendant R. Osborne to put in place individuals completely subservient to him at high positions within the Company.  This has enabled Defendant R. Osborne to force EGAS to take actions for his own personal benefit, causing EGAS to engage in transactions with related entities under his control and enter into personal loans with himself.  Similarly, Defendant R. Osborne's family has also been the beneficiaries of the fruits of EGAS.  The Company pays for a Cadillac Escalade for one of Defendant R. Osborne's sons even though he is not an employee of the Company.  Recently, on November 20, 2013, EGAS named another one of Defendant R. Osborne's sons, Defendant G. Osborne, and a member of the Board the new president and chief operating officer of the Company.

11.     The lack of independence at EGAS and its subsidiaries, is of such concern, that the Consumer Counsel commented before the Department of Public Service Regulation Before the Public Service Commission of Montana that the Montana Commission may wish to either encourage or require Defendant R. Osborne and certain members of the Energy West's Board to relinquish their roles at the company. [8]

12.     Defendant R. Osborne and his Board have taken every opportunity to unjustly enrich themselves at the expense of the Company and its shareholders, consistently rewarding themselves and further establishing their positions within the Company.  The harm to the Company that has and will continue to flow from Defendants' conduct is significant.  For example, the 2013 Order recommends that all contracts with JDOG be voided, and that

---

[8] The Consumer Counsel's Comments were in connection with a review of Energy West Inc.'s, application to refinance certain debt issues and restructure Energy West.  Consumer Counsel recommended that the Montana Commission obtain more information and potentially require Defendant R. Osborne to relinquish his positions and control of Energy West.  Energy West is a subsidiary of EGAS.  Attached hereto as Exhibit C are the Montana Consumer Counsel's comments.

customers are refunded for paying artificially high gas, processing fees, and premiums paid JDOG.

13.    Knowing that trouble was imminent, Defendants Richard Osborne ("R. Osborne") and Thomas J. Smith abused their possession of this non-public information by unloading a massive amount of stock less than two weeks before the 2013 Order was published on November 13, 2013.  On October 31, 2013 Defendant R. Osborne sold 1 million shares (71% of his shareholdings) and Thomas Smith sold more than 50,000 shares (87% of his shareholdings) in an underwritten public offering at $10.00 per share.  As of December 5, 2013, a few weeks after the 2013 Order was published, the stock was trading at $8.08.

14.    The substantial decline in the share price is reflective of Defendants' false and/or misleading statements and failure to disclose material adverse facts about the Company's business.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose, among others: 1) In late 2012 the Company informed shareholders that its Board had approved the purchase of JDOG and sought their consent to proceed with the acquisition. Defendants however failed to disclose the JDOG price rigging scheme before shareholders were asked to approve the acquisition; 2) Defendants also failed to disclose the Company's lack of adequate internal controls.

15.    This litigation on behalf of EGAS seeks to rectify the conduct of the individuals bearing the ultimate responsibility for the Company's misconduct – the Board and senior EGAS executives – and to impose appropriate responsibility on those individuals.  Further, Plaintiff seeks to hold Defendants liable for depriving shareholders of their rights to democratically affect change within the Company causing EGAS to suffer, and to further enjoin such conduct. Because Defendants committed the wrongdoing alleged herein, they cannot reasonably be

expected to initiate litigation on the Company's behalf, and in fact, doing so would require Defendants to pursue litigation against themselves. Accordingly, Plaintiff, as a non-controlling and independent shareholder of EGAS proceeding derivatively on behalf of the Company, is the proper party to prosecute this lawsuit.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. 1331 because Plaintiff's claims arise under Section 14(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78n(a). This Court also has supplemental jurisdiction pursuant to 28 U.S.C. 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this Court pursuant to Section 27 of the Exchange Act and 28 U.S.C. 1391(a)(1) because: (1) one or more Defendants reside in this Judicial District, (2) Defendants maintain executive offices in this Judicial District; (3) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed within, occurred within this Judicial District, and (4) Defendants have received substantial compensation in this Judicial District by both conducting business in the District and by engaging in numerous activities having an effect in this Judicial District.

## THE PARTIES

**Plaintiff Shareholder**

18. Plaintiff is a current shareholder of EGAS and has been a shareholder of the Company at all times relevant hereto. Plaintiff is a citizen of the State of California.

19.     Nominal Defendant EGAS engages in the distribution and sale of natural gas to residential, commercial and industrial customers. EGAS is incorporated in the State of Ohio and is headquartered in Great Falls, Montana.

20.     EGAS is named in this Complaint solely as a nominal defendant pursuant to principles regarding the joinder of indispensable parties, which provide for EGAS's joinder as a nominal defendant in whose name the suit is brought derivatively.  In light of Defendants' control over EGAS, Plaintiff believes that EGAS's management is antagonistic to Plaintiff and the relief he seeks herein, and accordingly, EGAS is treated as a defendant for diversity jurisdiction purposes.

21.     Defendant Richard M. Osborne ("R. Osborne") is, and at all relevant times was, CEO and Chairman of the Board. Mr. R. Osborne has been the Company's CEO since November 2007 and a director of the Company since 2003. He is the President and CEO of OsAir, Inc., a company which operates as a property developer and manufacturer of industrial gases for pipeline delivery.  From 1994 to October 2003, he served in various capacities, including director, Vice Chairman of the Board, and Chairman of the Board, for GLB Bancorp, Inc., a publicly-held bank holding company headquartered in Mentor, Ohio. Since September 1998, Mr. Osborne has been a director of John D. Oil and Gas Company, a publicly held oil and gas exploration company in Mentor, Ohio.  Additionally, R. Osborne is the sole Manager of Turkey Vulture Fund XIII, Ltd., which began operations in January 1995 to acquire, hold, sell or otherwise invest in all types of securities and other investments.  Turkey Vulture Fund is located in Mentor, Ohio.  Plaintiff is informed and believes, and thereupon alleges, that Mr. R. Osborne is a citizen of the State of Ohio.

22.     Defendant Thomas J. Smith ("Smith") is, and at all relevant times was, Chief CFO of the Company since November 2007 and a director of the Company since 2003.  Mr. Smith is a director of John D. Oil and Gas Company, a publicly held oil and gas exploration company in Mentor, Ohio. Mr. Smith served as a director of GLB Bancorp, Inc. from 1994 to October 2003.  Plaintiff is informed and believes, and thereupon alleges, that Smith is a citizen of the State of Florida.  On December 4, 2013 the Company announced the planned retirement of Defendant Smith.  It is unclear when his retirement will become effective.

23.     Defendant Wilbur Eugene Argo ("Argo") is, and at all relevant times was, a director of EGAS.  He is the President and General Manager of Midwest Energy, Inc., a gas and electric cooperative in Hays, Kansas, in which capacity he has served since 1992.  Mr. Argo serves as the Chairman of the Compensation Committee.  Plaintiff is informed and believes, and thereupon alleges, that Argo is a citizen of the State of California.

24.     Defendant Michael T. Victor ("Victor") is, and at all relevant times was, a director of EGAS. Mr. Victor has served as a member of the Company's Board since June 2010. Michael Victor is the president of Lake Erie College, a private liberal arts college located in Painesville, Ohio, holding this position since 2006.  From 2002 through 2005, he served as dean of the Walker School of Business, Communication and Hotel, Restaurant and Institutional Management at Mercyhurst College, a private liberal arts college located in Erie, Pennsylvania. Mr. Victor also serves as trustee of the Ohio Foundation of Independent Colleges and Universities. Plaintiff is informed and believes, and thereupon alleges, that Victor is a citizen of the State of Pennsylvania.

25.     Defendant Gregory Osborne ("G. Osborne") is, and at all relevant times was, a director of EGAS. Gregory Osborne has been president and chief operating officer of John D.

Oil and Gas Company, a publicly-held oil and gas exploration company, since April 2006 and a director of John D. Oil and Gas since February 2006. From 2003 until joining John D. Oil and Gas, he was president of Great Plains Exploration LLC, an oil and gas exploration company based in Mentor, Ohio that owns and operates oil and gas wells. From 2001 until joining Great Plains, he served as executive vice president of Orwell Natural Gas Company, a regulated gas public utility company operating in Ohio. He is a director of Corning Natural Gas Corporation, a publicly held public utility company in Corning, New York, and a trustee of the Ohio Oil and Gas Association. He is the son of Richard M. Osborne, the Company's Chairman and Chief Executive Officer. Plaintiff is informed and believes, and thereupon alleges, that G. Osborne is a citizen of the State of Ohio.

26. Defendant Wade F. Brooksby ("Brooksby") is, and at all relevant times was, a director of EGAS. Mr. Brooksby formerly was Vice President & Chief Financial Officer and a director of InNexus Biotechnology Inc., a Toronto Stock Exchange traded drug development company. His extensive background includes board of director positions for Zila Inc.; Bungee International Mfg.; Alamo Learning Systems; US Minerals & Royalty Corp; Geochemical Survey and Sands America as well as various chief executive management positions in public and private companies. His career began with the then Price Waterhouse & Co. as a C.P.A. Mr. Brooksby was also CFO from 2004 through 2006 of Energy West, Incorporated, EGAS's wholly-owned subsidiary. Plaintiff is informed and believes, and thereupon alleges, that Brooksby is a citizen of the State of Arizona.

27. Defendant John Male ("Male") is, and at all relevant times was, a director of EGAS. Mr. Male previously served as Chairman and CEO of PVF Capital Corp, a NASDAQ traded bank holding company for Park View Federal Savings Bank. He currently serves on the

Board of Trustees of University Hospital's Extended Care Campus, formerly known as Heather Hill Hospital, and additionally served as a trustee for various charitable organizations. He holds a BA in economics from Tufts University and an MBA from Case Western Reserve University. Plaintiff is informed and believes, and thereupon alleges, that Male is a citizen of the State of Ohio.

28.     Defendant Richard K. Greaves ("Greaves") is, and at all relevant times was, a director of EGAS since July 31, 2013. Mr. Greaves, 42, a C.P.A., has been in private practice since 2011 providing accounting, tax preparation, tax planning and business consulting services to individuals and corporations. Mr. Greaves is also President and Chief Financial Officer of RGP LLC, a firm specializing in acquiring, rehabilitating and leasing residential real estate in Lake and Cuyahoga County, Ohio. Mr. Greaves joined Ernst & Young LLP in Cleveland, Ohio in 1993, where he served as a partner from 2008 to 2011, focusing on accounting and financial reporting for both private and public companies in the manufacturing, consumer products and distribution industries. Mr. Greaves is a member of the American Institute of Certified Public Accountants and the Ohio Society of CPA's. Plaintiff is informed and believes, and thereupon alleges, that Greaves is a citizen of the State of Ohio.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company the fiduciary obligations of good faith, trust, loyalty, and due care and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

30.     Each director and officer of the Company owes to EGAS the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of EGAS, were directly and/or indirectly able to and did exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their executive, managerial and directorial positions with EGAS, each of the Individual Defendants had access to adverse, non-public information about the unlawful conduct alleged herein.

32.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of EGAS, and was at all times acting within the course and scope of such agency.

33.     To discharge their duties, the officers and directors of EGAS were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of EGAS were required to, among other things:

a.     manage, conduct, supervise and direct the business affairs of EGAS in accordance with all applicable laws;

b.     establish and maintain systematic and accurate records and reports of the business and affairs of EGAS and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

c.     neither engage in self-dealing nor knowingly permit any officer, director or employee of EGAS to engage in self-dealing;

d.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

       e.       conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

       f.       refrain from acting upon material inside corporate information to benefit themselves; and

34.    remain informed of how EGAS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

35.    Each Individual Defendant, by virtue of his or her position as a director and officer, owed to the Company the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein posed a risk of serious injury to the Company and involves a violation of their obligations as directors and officers of EGAS, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware of.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised EGAS's Board.

36.    The Individual Defendants breached their duties of loyalty and good faith by allowing Defendant R. Osborne to take self-interested and entrenching actions, without regard to legal norms, as set forth herein.

37.    Additionally, EGAS has adopted a written Code of Business Conduct (the "Code") which provides in relevant part that:

       Because of our commitment to a strong set of values and principles, the Board of Directors of Gas Natural Inc. (the "Company") has adopted a written Code of Business Conduct (the "Code"), which follows this letter. Maintaining

our reputation includes adhering to the Code. By following our Code we can maintain the Company as a good workplace for our employees, a good provider of products and services for our customers, a good investment for our stockholders and a good citizen in our communities.

38.     The Code further provides that the Company's Board of Directors has the responsibility to provide corporate oversight for the Company and should refrain from certain acts such as buying or selling company stock if they have access to material inside information that has not been made public and recuse themselves from participation in decisions where there is a conflict between their personal interests and the interest of the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

40.     In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

41.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct that caused the Company to conceal the true facts that EGAS was misrepresenting the adequacy of its internal controls and violating applicable laws.

42.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

a.     conceal the Company's allowing of Individual Defendants to entrench themselves in the Company to the Company's detriment; and

- 16 -

b.    deceive the investing public, including shareholders of EGAS, regarding the Individual Defendants' management of EGAS's operations.

43.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## **BACKGROUND**

### **The Company's Ohio Operations**

44.    The 2013 Order relates to the regulation of Northeast Ohio Natural Gas Corporation ("Northeast") and Orwell Natural Gas Company ("Orwell").

45.    Northeast and Orwell are local distribution companies serving portions of Ohio. Northeast was founded in 1986 by Ellis T. Meyers and then acquired by Marbel Energy Corporation ("Marbel") in 1998.  In June 2003, Northeast was purchased by Great Plains Natural Gas Company ("Great Plains") which was owned at the time by Defendant R. Osborne.

46.    Orwell was formed by Willard Scott in 1986.  In 2002 Mr. Scott transferred of all Orwell's stock to Lightning Pipeline Company ("Lightning"). Lightning Stock was held primarily by the Richard M. Osborne Trust ("Osborne Trust").  Defendant R. Osborne is the sole trustee of the Osborne Trust.

47.    In 2007, Defendant R. Osborne was brought in to turn around Energy West, Inc. ("Energy West").  Defendant R. Osborne began implementing a roll-up business plan which

involves purchasing individual business in a fragmented industry and gaining economies of scale through growth.

48.     In 2008, Energy West purchased all of the stock of Lightning, Orwell, Northeast, as well as Brainard Gas Corporation.  Each of these entities were primarily owned by the Osborne Trust.  In addition, Defendant Smith was a shareholder and officer of the acquired companies.

49.     In 2009, Energy Inc. undertook a reorganization into a holding company as the successor to Energy West, Inc., now a direct wholly-owned subsidiary of EGAS.  Today, EGAS operates a natural gas company, operating local distribution companies in seven states and operating in five primary business segments.

**A Brief Overview of EGAS**

50.     EGAS is the parent company of multiple subsidiaries including: Brainard, Energy West, GNR, GNSC, Great Plains, Independence, Lightning Pipeline and PGC.  Brainard is a natural gas utility company with operations in Ohio.  Energy West is the parent company of multiple entities that are natural gas utility companies with regulated operations in Maine, Montana, North Carolina, and Wyoming as well as non-regulated operations in Maine, Montana and Wyoming.  GNR is a natural gas marketing company that markets gas in Ohio.  GNSC manages gas procurement, transportation and storage for Brainard and subsidiaries of Lightning Pipeline and Great Plains.  Great Plains is the parent company of Northeast, which is a regulated natural gas distribution company with operations in Ohio.  Lightning Pipeline is the parent company of Orwell, a regulated natural gas distribution company with operations in Ohio.  The Osborne Trust is the majority shareholder for the following companies affiliated with EGAS: JDOG, Great Plains, Cobra, and Orwell-Trumbull Pipeline Co., LLC.

## SUBSTANTIVE ALLEGATIONS

**The 2010 Audit**

51.     Beginning in 2007, EGAS started using JDOG as the sole entity responsible for gas purchases.  Prior to that time, EGAS purchased local production at an average rate that was 1.03 per Mcf less than the average cost of interstate gas supplies.  However, a 2010 PUCO audit found evidence that EGAS was paying higher than normal prices for gas from related parties and then passing along this inflated cost to regulated utility customers.  PUCO explained that once JDOG began purchasing gas production, the average cost of local gas became $0.85 per Mcf more than the average cost of interstate gas. EGAS's use of JDOG as the sole purchaser appears to have resulted in the systemic overcharging of utility customers.  This is made more apparent considering JDOG sold gas to Piedmont Gas Company, an independent utility company, at prices significantly lower than the prices paid by EGAS affiliated companies (Northeast and Orwell) to JDOG during this period.  The 2010 Audit also raised significant questions concerning the corporate structure of EGAS, particularly its use of related companies and affiliated subsidiaries in its gas transactions.

52.     As a result of the 2010 Audit, the Company entered into the 2011 Stipulation requiring it to effectively terminate its contracts for purchases from affiliated companies and implement a request for proposal ("RFP") for competitive bidding for its gas supply. However, EGAS failed to comply with the Opinion and Order.

53.     Instead of implementing a fair and open RFP process as required by PUCO, EGAS implemented a process contrived to put in place its own related company.

**The 2012 Audit**

54.     PUCO's staff performed a similar audit to the one conducted in 2010 and filed their report (the "2012 Report") on February 28, 2013.  The 2012 Report was a scathing indictment of the Company and found that EGAS disregarded the Commission's order to terminate its supply contract with JDOG and initiate a competitive RFP for purchases of local gas production.    The 2012 Report reveals that nearly a year after the agreed upon contract termination deadline, on October 1, 2012 the Company sent out its first RFP.  According to PUCO, this RFP contained purposely vague and ambiguous language, discouraging entities from submitting applications. Moreover, EGAS's RFP lacked necessary historical information, which further discouraged bidders from making competitive offers.

55.     Due to this flawed process, the only entity to submit a proposal was JDOG. Therefore, EGAS again awarded JDOG the contract, even though PUCO specifically required the RFP process to avoid a JDOG supply contract.  The 2012 Report also found that the RFP was intentionally set up so that its affiliated company, JDOG, of which the Osborne Trust is the majority shareholder, would win the contract.  Additionally, the 2012 Report found that JDOG systemically overpaid for natural gas purchases which resulted in premium payments due to JDOG at the expense of utility customers. The 2012 Report further found that EGAS's subsidiaries charged customers with a processing fee, which was paid to Cobra, an affiliated company, for gas that was never actually processed. In fact, the report outlined that when an employee attempted to verify the processing of volumes being charged a processing fee by Cobra, this employee was terminated by the Company.

56.     As a result, the 2013 Order found that gas costs passed on to consumers were not "fair, just and reasonable," and that EGAS's subsidiaries failed to substantiate the premiums

charged by JDOG as well as the processing fees charged by Cobra.  The 2013 Order further finds that EGAS's subsidiaries failed to terminate purchase contracts as directed by the 2011 Stipulation.   The perpetration of this scheme is directly attributable to the utter lack of EGAS and its subsidiaries to observe corporate formalities and maintain effective internal controls.

### Montana Consumer Counsel's Comments

57.     PUCO is not the only state regulatory entity that Defendant R. Osborne has sought to frustrate.  In 2012, Energy West, EGAS' predecessor, filed an application with the Public Service Commission of the Department of Public Service Regulation of the State of Montana (the "Montana Commission") to refinance certain debt issues and requesting the waiver of certain ring-fencing requirements.  The Montana Commission conducted a hearing on the application on May 11, 2012 and before it had entered an order Energy West filed a motion on June 13, 2012 to reopen the record in the case to submit a new refinancing proposal.  The Consumer Counsel of Montana filed their comments with respect to the renewed application on July 11, 2012.  The Consumer Counsel found that the application sought to significantly structure Energy West and "both complicate and limit the Commission's ability to implement sound and comprehensive regulatory controls that are sufficient to protect the interests of Montana utility rate payers."

58.     In attempting to research the proposed restructuring, Montana's Consumer Counsel stated "the Company has seemingly tried to frustrate attempts to reasonably evaluate the motivations driving its new restructuring proposal" and "in response to data and information requests…including information represented to board members and correspondence between officers and employees of EQI and its parent holding company, Gas Natural, Inc. (GNI), the

Company has stated quite surprisingly, that "There is no written documentation of this analysis.""

### Failure to Maintain Effective Internal Controls

59.     The 2013 Order reveals that the 2012 Audit found evidence of "severe organizational dysfunction" at EGAS's subsidiaries and that there was "a general indifference and unawareness of positional titles held by management within the Companies and the accompanying fiduciary duties and responsibilities." Defendant Smith apparently testified to PUCO staff that:

> he was unaware of whether he held corporate titles, including president, to various related companies of Northeast and Orwell, including Spelman, Lightning, and Gas Natural. He testified that he was president of Cobra, but acknowledged that he had no functional involvement; was president of OTP, but did not oversee the operations or accounting, and did not recall who was the functional head of the company; was president of Spelman but was unaware of its customers; and was president of two related companies. Great Plains and Lighting, which are "shell" holding companies designed to shield Mr. Osborne from liability and for which no one reported. He also indicated that he thought he was president of Gas Natural "…but I can't be certain" and when referring to JDOG, he stated: "I don't recall whether I was an officer of that or not."

60.     Cindy Rolf, a staff accountant at EGAS's subsidiaries testified that while the Company's subsidiaries had internal controls they were not followed and "no one was designated to measure those controls were implemented." She further testified that in 2012, Defendant Smith asked her to modify the GCR rate to be higher than it should have been. The Order concludes:

> The evidence shows the Companies had internal auditing controls, but these controls were disregarded and none of the Companies' witnesses were aware of the individual responsible to make sure those controls were implemented. Further, the evidence shows that senior management were unaware of who the SOX compliance officer was at Northeast, Orwell, or Gas Natural. In addition, although the Companies claim that there had been independent external audits of the Companies, no evidence was produced by the Companies of any such audit report showing that their internal controls had either been assessed by

management or were effective. The evidence also demonstrates that, in many cases Company management placed individuals in positions of responsibility for ensuring proper accountability, yet these individuals were not performing in a manner to ensure such controls were followed. ***This evidence points to a culture of indifference among management of the Companies as it relates to internal controls.***

(emphasis added).

61.     WHISTLEBLOWER 1 worked in the Controller's office in Mentor, Ohio providing accounting functions and working with the Company's auditors in preparation of its annual audits.     WHISTLEBLOWER 1 indicated that after the 2010 Audit controls were supposed to be put in place that curbed related party transactions and the bid rigging process had occurred with JDOG.  However, nothing changed.  WHISTLEBLOWER 1 stated documentation was created to give the impression that the Company was in compliance with 2011 stipulation but in reality it was not.  When questions were raised, employees were terminated, including WHISTLEBLOWER 1.

62.     According to WHISTLEBLOWER 1, Ms. Rolf who was working with PUCO to rectify the various problems found in PUCO's audits was terminated after clashing with Rebecca Howell and Anita Noce who wanted to continue the "old way" of operating.   Cindy Rolf's replacement according to WHISTLEBLOWER 1 was also terminated for "asking questions." Similarly, Jonathan Harrington, the Company's controller was terminated in favor of Rebecca Howell, who WHISTLEBLOWER 1 indicates was much less willing to question Defendant R. Osborne's directives.  Additionally, WHISTLEBLOWER 1 indicates that when WHISTLEBLOWER 1 raised questions with the Company's outside auditors the auditors instructed WHISTLEBLOWER 1 to utilize the Company hotline. WHISTLEBLOWER 1 contacted the hotline but to WHISTLEBLOWER 1's knowledge no investigation was ever made at the Company with respect to the issues that WHISTLEBLOWER 1 raised.

63.     The Company's internal controls were so poor that WHISTLEBLOWER 1 indicates that persons in the Controller's office could manually create spreadsheets to provide to the auditors in an effort to cover what was happening.  There were no internal controls with respect to the Ohio entities of the Company according to WHISTLEBLOWER 1 and the accounting system for Ohio was different than the system used for the other states that the Company operated within.  The lack of internal controls allowed Defendant R. Osborne engage in the transactions complained of herein, like rigging the purchase process of natural gas and even having invoices at the Company paid twice.

64.     It is not surprising then that the 2013 Order found that there is a functional absence of responsible persons serving in management positions at EGAS's subsidiaries:

> We are troubled by the evidence that shows records and information of the Companies were accessible to their nonregulated affiliates and related companies. Noteworthy is the evidence that the Companies had internal auditing controls but failed to ensure that the controls necessary for internal auditing were followed. In addition, there is evidence that the Companies gave dubious accounting treatment to a company vehicle owned by a relative of the owner of the Companies, gave preferential treatment to invoice payments from related or affiliated companies over those of nonrelated companies, and gave personal loans to senior management. The extent of the unawareness and negligence of the senior management of the Companies to their managerial and fiduciary duties and responsibilities, the failure to enforce internal controls, the lack of control over access to company records, the impropriety of the compensation system for employees of the Companies, and the functional absence of responsible persons serving in management positions, ***all of these situational deficiencies appear to be the norm, rather than the exception***…

(emphasis added).

65.     In the Company's most recent Quarterly Report it acknowledges the failure of internal controls.  Stating in relevant part:

> As of September 30, 2013, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended. The evaluation was carried out under the supervision of and with the participation of our management,

- 24 -

including our principal executive officer and principal financial officer. Based upon this evaluation, our chief executive officer and chief financial officer each concluded that our disclosure controls and procedures were not effective as of September 30, 2013.

**Defendant R. Osborne's Complete Domination of EGAS**

66.     Defendant R. Osborne uses the Company to accomplish his own goals rather than creating value for EGAS or its public shareholders.  PUCO's staff found that Defendant R. Osborne "exerts authority and control" over EGAS's subsidiaries and the extent of his involvement is "pervasive."  The Montana Consumer Counsel has stated that depending on information obtained

> it may be well to encourage or to the extent possible, require that Mr. Osborne relinquish his active roles with EWI, as well and his operational, management and financial control of EWI (including his positions as chairman and CEO).  To the extent that Mr. Osborne retains any direct or indirect interest in the Company, it may be preferable for that to be limited to one of passive investment. Likewise, consideration to reflect the fact that the Company is a regulated Montana utility by replacing those current Board members who are Mr. Osborne's personal and business associates with independent directors having Montana interests.

67.     The Montana Consumer Counsel further commented that all eight of Energy West's current directors were also directors of Gas natural and three of them have 'various other business affiliations with Mr. Osborne in recent years."

68.     Defendant R. Osborne has used his control over the Company to put in place employees at the Company who lack independence from him.  For example, Rebecca Howell ("Ms. Howell"), worked for worked for Defendant R. Osborne's privately controlled entities before their purchase by Energy West.  Ms. Howell went on to be president of Cobra.  After the termination of Gas Natural's controller in October 2012, Ms. Howell was named controller of the Company even though no public company experience.  WHISTLEBLOWER 1 stated R. Osborne "trusted [Howell] to do things his way."  Notably, according to WHISTLEBLOWER 1, Ms. Howell's daughter on occasion worked for the Company and her husband was hired to be a

meter reader and paid at a higher rate than other meter readers with longer tenure at the Company.

69.    Ms. Howell maintained her position as controller of the Company until shortly after the July 2013 PUCO hearings and then relinquished the position to Donald Whiteman who was previously controller of the OZ Group (Defendant R. Osborne's privately held companies consisting of OsAir, OzGas, & the Matchworks Building).

70.    Similarly, Defendant Smith as described above has been a longstanding colleague of Defendant R. Osborne.    Likewise, according to WHISTLEBLOWER 1, when Kevin Degenstein, EGAS's President and Chief Operating Officer refused to move to Ohio from Montana, he was relieved of his duties in favor of Defendant G. Osborne.

71.    According to WHISTLEBLOWER 1, Defendant R. Osborne's control was so great that the Board and its audit committee are scared to vote against him.    As a result of Defendant R. Osborne's domination, he has utilized the Company to invest in a web of related transactions designed to favor his personal interests.    The most egregious of the related party transactions involve his personal pipelines.    WHISTLEBLOWER 1 has stated that the Company would purchase gas from these entities even though cheaper gas could be found elsewhere.    With respect to the private entities controlled by R. Osborne, according to WHISTLEBLOWER 1, Defendant R. Osborne would require payment of invoices to his entities before outside vendors were paid.

72.    Moreover, the Company would engage in various schemes to overlook the obligations of these entities to EGAS' various subsidiaries. As described above, auditors declared that the Company would have to write off receivables from these entities.  Defendant R. Osborne initially instructed Ms. Howell to fire the auditors, however this wasn't a realistic option

with the Company's 2012 annual SEC filing due in such a short time frame. Thus, a scheme was orchestrated whereby the receivables were covered by Northeast and Orwell and then the private entities issued credit memos. The credit memos effectively were a method of forgiving the debts owed. According to WHISTLEBLOWER 1, Ms. Howell, then began to examine ways to offset the credit memos by seeing if more gas had been sold then had been charged for and even suggesting the billing method for these entities could be changed to incrementally increase the revenue going to them.

73. The Company's auditors indicated that they would test whether the credit memos described above were properly applied. Although he was told he would get whatever he wanted done, Defendant R. Osborne was cautioned with respect to the payment of future invoices he requested where credits were used to offset them would be given enhanced scrutiny by the Company's auditors. It is unclear if he has heeded the advice.

74. The prior transactions are just a few of numerous related party transactions that have occurred at the Company. Other examples of related party transactions include:

a. The 2010 purchase of Lightning and Great Plain for $37.9 million. Lightning and Great Plains are the parent companies of Orwell, Northeast, Brainard and Great Plains Land Development;

b. The December 2011 purchase of 9.24 acres of land from Black Bear Realty Ltd for $600,000. Black Bear is a company owned and controlled by Defendant R. Osborne;

c. The April 2012 purchase of JDOG. The Osborne Trust owns approximately 86% of JDOG. Defendant R. Osborne is the sole managing member of JDOG. Defendant Smith is president and chief operating officer of JDOG. On January 11, 2012 JDOG

filed for Chapter 11 reorganization in U.S. Bankruptcy Court in Erie, PA related to $30 million in defaulted loans.  According to 8-K filings with the Securities and Exchange Commission, on December 11, 2011, Independence Oil and LP Gas, a Gas Natural subsidiary, entered into a Gas Natural Board-approved Appointment of Agent for Wholesale Propane Purchases Agreement with John D. Oil and Gas Marketing Company LLC ("JDOGM" owned and controlled by Defendant R. Osborne) under which JDOGM was appointed as GNI's agent for procuring LPG gas from wholesale suppliers and assumed responsibility for monitoring the inventory levels of Independence's propane storage tank facilities. Later, on April 18, 2012, following the John D. Oil and Gas bankruptcy filing, Gas Natural entered into a Board approved agreement to acquire JDOGM from Mr. Osborne for $2,875,000 of Gas Natural common stock to be newly issued by Gas Natural;

>        d.        The March 2013 purchase of the Matchworks Building in Mentor Ohio from entities owned by Defendant R. Osborne for $1.5 million.  According to WHISTLEBLOWER 1, Northeast purchased the Matchworks building while it was under receivership and only requested an appraisal of the building after the purchase was complete. The appraisal was conducted by Steven Calabrese, who had prior business dealings with Defendant R. Osborne.  Also according to WHISTLEBLOWER 1, while still in receivership, Brainard Natural Gas, a subsidiary of the Company, deposited a check in Marchworks as a customer payment until Defendant R. Osborne requested the monies.  These monies were then distributed to Defendant R. Osborne relieving the credit balance for the customer created account;

>        e.        An ongoing lease agreement between Energy West and OsAir Inc. an entity owned by the Osborne Trust;

f.      Northeast, Orwell and Brainard entered contracts for the sale and purchase of natural gas with Great Plains, a company owned by the Osborne Trust, in 2011. These agreements were replaced by a new contract with GNSC effective April 1, 2011. The 2011 contract was subsequently replaced by a new agreement between GNSC and Great Plains Exploration, effective November 28, 2012, establishing new price terms for the intrastate purchase of natural gas. GNSC also entered into new contracts for the intrastate sale and purchase of natural gas with JDOG, OsAir, John D. Resources, LLC, a company owned by Defendant R. Osborne (effective November 28, 2012), and Mentor Energy and Resources Company, a company owned by Richard Osborne (effective November 28, 2012);

g.      Orwell and Brainard have an agreement with Orwell-Trumbull Pipeline Co, LLC, owned by the Osborne Trust, for transportation service on its intrastate pipeline. Additionally, Northeast, Orwell and Brainard have transportation agreements with COBRA Pipeline Co, also owned by the Osborne Trust; and

h.      The Company has made a $2.1 million investment in Kykuit.  JDOG is a management member of Kykuit and owns 23.2% of the membership interests.  Additionally, Defendant R. Osborne owns a 26.4% membership interest in Kykuit.

75.      The 2013 Order contained multiple allegations as to "responsible fiduciary conduct" of Defendant R. Osborne including the financial treatment of a Cadillac Escalade purchase for one of Defendant R. Osborne's sons, who at the time of purchase was not a Company employee, the accounting of which was later corrected by "employing" Defendant R. Osborne's son.  PUCO's staff found evidence of EGAS's subsidiaries making personal loans to Defendant R. Osborne, which Defendant R. Osborne replied would be paid in any given week.

EGAS's Board abdicated its responsibility of oversight, and instead has allowed Defendant R. Osborne to entangle EGAS in the wrongdoing alleged herein.

76.     Defendant R. Osborne has managed to firmly entrench himself and the Board of his choosing. His actions, along with the remaining defendants who have willfully neglected their roles as fiduciaries of the Company and its shareholders have caused the Company significant injury.  The pattern and practice of Defendants' breaches of their fiduciary duties to the Company and its shareholders subjects, and will persist in subjecting EGAS to harm because the adverse consequences of the injurious effects are ongoing.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS

77.     On September 25, 2012 Defendants caused the Company to file a Preliminary Proxy Statement with the SEC noticing the Company's upcoming shareholder annual meeting and asking shareholders to ratify, among other things, the Company's acquisition of JDOG and approval of the issuance of shares as consideration for the acquisition.  The Company asked for shareholder approval of the acquisition pursuant to the Ohio Revised Code, which restricts certain transactions and business combinations between a corporation and an interested stockholder without such approval.  Additionally, pursuant to NYSE MKT rules the Company needed to seek shareholder approval as a prerequisite to listing additional shares to be issued as consideration for JDOG's acquisition. The proxy statement made certain representations with respect to the stipulation entered into with PUCO in 2011 such as the following:

> John D. Marketing had various gas purchase agreements with our Ohio subsidiaries that accounted for 52% of John D. Marketing's revenues in 2011. Pursuant to the stipulation issued by the PUCO in October 2011, these agreements were terminated and are subject to an annual competitive bid process in which John D. Marketing will participate. We cannot guarantee that John D. Marketing will be the successful bidder for these new gas purchase agreements. If John D. Marketing is not the successful bidder, its revenues and value to us will be negatively impacted.

78.     The Company subsequently filed additional proxy statements with the SEC in support of shareholder ratification of the JDOG acquisition in advance of the 2012 annual shareholder meeting on October 29, 2012, November 13, 2012, November 14, 2012, and December 3, 2012.  However, as of the Company's annual meeting date, December 13, 2012, the proposals related to the acquisition of JDOG were not shareholder approved because the Company failed to obtain a sufficient number of votes.  It was not until March 1, 2013, that Defendants secured enough votes in favor of the Company acquiring JDOG.

79.     Given the nature of the JDOG transaction, shareholders were entitled to be provided with all material information to make a fully informed decision in voting their shares. Yet Defendants failed to provide such information.  The proxy materials filed by the Company in connection with the JDOG transaction failed to disclose that EGAS rigged the natural gas purchase process so JDOG would win the contract and that JDOG then systematically overpaid for natural gas purchases resulting in premium payments due to JDOG at the expense of utility customers.  Given the recommendation that PUCO made in its Order regarding JDOG and revenues derived from the transactions JDOG engaged in, this information was vital material information to shareholders voting on the acquisition.

80.     Similarly, the Company included false and misleading information with respect to its internal controls in advance of the Company's June 26, 2013 annual shareholder meeting.  On May 10, 2013 the Company filed a Definitive Proxy Statement that stated:

> In reliance upon (1) the audit committee's reviews and discussions with management and ParenteBeard, (2) management's assessment of the effectiveness of our internal control over financial reporting, and (3) the receipt of an opinion from ParenteBeard, dated April 1, 2013, stating that the Gas Natural financial statements for the year ended December 31, 2012 are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles, the audit committee recommended to our board that these audited

financial statements be included in our Form 10-K for the year ended December 31, 2012, for filing with the SEC.

81.     Defendants made similar representations in the Company's quarterly reports.  For example, on May 15, 2013 the Company filed on Form 10-Q with the SEC its quarterly report for the quarterly period ended March 31, 2013.  The 10-Q included the following representations about the Company's disclosure and internal controls and Defendants Smith and R. Osborne's certification thereon:

### ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

As of March 31, 2013, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities Exchange Act. The evaluation was carried out under the supervision of and with the participation of our management, including our principal executive officer and principal financial officer. Based upon this evaluation, our chief executive officer and chief financial officer each concluded that our disclosure controls and procedures were effective as of March 31, 2013.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

82.     The Individual Defendants knew or reasonably should have known that the Company was filing misleading proxy materials.

83.     In stark contrast to the certifications signed by the Defendants attesting to the adequacy of internal controls over financial reporting, Defendants' statements were materially false and misleading.

84.      The Exchange Act requires every issuer that has securities registered pursuant to Section 12 of the Exchange Act to devise and maintain a system of internal accounting controls

sufficient to reasonably assure, among other things, that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

"Internal control" is defined as:

[a] process - effected by an entity's board of directors, management, and other personnel - designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations.

AU §319.06

84.     "Reportable conditions" "are matters coming to the auditors attention that in his judgment should be communicated to the audit committee because they represent significant deficiencies in the design or operation of internal control, which could adversely affect the organizations because they represent significant deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to initiate, record, process and report financial data consistent with assertions of management in the financial statements." AU §325.02.

85.     In turn: "a reportable condition may be of such magnitude as to be considered a material weakness.  A material weakness in internal control

is a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing assigned functions.

AU § 325.15.

86.     Despite these weaknesses in internal controls, EGAS's financials stated that the Company's internal controls over financial reporting were effective.  As revealed in the Company's most recent 10-Q this was false and misleading.

87.     On November 19, 2013, the Company filed its Quarterly Report for the Quarter ending September 30, 2013.  The Quarterly Report disclosed the following:

As of September 30, 2013, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended. The evaluation was carried out under the supervision of and with the participation of our management, including our principal executive officer and principal financial officer. Based upon this evaluation, our chief executive officer and chief financial officer each concluded that our disclosure controls and procedures were not effective as of September 30, 2013.

In our assessment of the effectiveness of internal control over financial reporting at September 30, 2013, we have identified a material weakness. In 2011, the PUCO, following a gas cost recovery audit, directed us to modify the gas procurement procedures at our Ohio utilities, NEO and Orwell, and adjust amounts billed to our Ohio customers for the audit period. In its audit in 2012, the PUCO staff argued that we failed to comply with the procedures set forth in the prior GCR audit. This led to the disallowance of gas costs in the PUCO's November 13, 2013 Order as discussed in *Note 15 — Subsequent Events* of our accompanying consolidated financial statements. We accrued the amount of the disallowance in the three months ended June 30, 2013 and it remains on our balance sheet as of September 30, 2013. The failure to comply with the PUCO procedure leads management to conclude that we did not maintain adequate and effective internal control in the area of our gas supply procurement and the gas cost recovery through rates.

We have implemented and continue to implement measures that we believe will remediate the material weakness in our internal control over financial reporting described above. We have accrued the amount of the disallowance in the three months ended June 30, 2013 and are in the process of implementing additional controls and procedures to ensure that we adhere to the PUCO Order for future gas procurement procedures. In addition we performed additional analyses and implemented additional procedures designed to provide reasonable assurance that our consolidated financial statements were prepared in accordance with GAAP. As a result, we believe that the condensed consolidated financial statements included in this Form 10-Q as of and for the three and nine months ended September 30, 2013 fairly present, in all material respects, our financial condition, results of operations and cash flow for the periods presented, in conformity with GAAP. We have implemented other changes at Gas Natural to improve our internal control over financial reporting such as (1) hiring a new corporate controller, a new controller at our Ohio utilities and two new general accountants, (2) attending training sessions given by the PUCO for gas recovery procedures, and (3) effecting other corporate and accounting changes referenced

in the PUCO Order. We expect to continue our remediation efforts, which will include design, implementation and testing, throughout the fourth quarter of 2013.

We believe that the remediation measures described above will strengthen our internal control over financial reporting and remediate the material weakness we have identified. We are committed to continuing to improve our internal control processes and will continue to diligently review our financial controls and procedures.

**Defendants R. Osborne and Smith Sell their Stock**

88.     During the Relevant Period, Defendants R. Osborne and Smith sold shares of EGAS stock while in possession of material adverse information about EGAS's business, operations, and financial condition which they knew had not been disclosed the public.  Knowing that trouble was ahead and just shortly before the 2013 Order was released, the Company's CEO and CFO, Defendants R. Osborne and Smith, sold large amounts of their stock in the Company in an offering. Defendant R. Osborne sold over 1 million shares (71% of his stake) while Defendant Smith sold 87% of his stock. Moreover, the Company issued 80,000 shares as part of the offering even though this cash infusion was unnecessary due to the fact that the Company had over $11 million in cash on the balance sheet.

89.     On November 5, 2013 a Schedule 13D was filed with respect to Defendants R. Osborne and Smith's sale of shares. It read in relevant part:

This Amendment No. 19 to Schedule 13D is filed by Richard M. Osborne relating to shares of common stock, par value $0.15 per share (the "Shares"), of Gas Natural Inc. (the "Company"). This Amendment No. 19 is filed to reflect the sale by Mr. Osborne, as trustee of Richard M. Osborne Trust UTA January 13, 1995, as amended and restated on February 24, 2012 (the "Trust"), of Shares in a registered public offering (the "Offering").

As reported in the Company's Form 8-K dated October 31, 2013, the Company entered into an Underwriting Agreement dated October 31, 2013 (the "Underwriting Agreement"), with Janney Montgomery Scott LLC, as representative of the several underwriters named therein (the "Underwriters"), the Trust and Thomas J. Smith, as selling shareholders. Under the Underwriting Agreement, the Underwriters agreed to purchase for resale to the public in a firm

commitment underwritten offering 80,000 Shares from Company, 1,006,911 Shares from the Trust and 47,244 Shares from Mr. Smith at a price of $10.00 per Share, less an underwriting discount of 5.75%. Under the Underwriting Agreement, the Company also granted to the Underwriters a 30-day option to purchase up to an additional 170,000 Shares to cover over-allotments, if any. All Shares sold by the Trust in the Offering were pledged by Mr. Osborne to FirstMerit Bank, N.A. ("FirstMerit") as collateral to secure certain loans unrelated to the Company (the "Secured Obligations"). The proceeds from the sale of the 1,006,911 shares owned by the Trust were paid directly to FirstMerit to be applied to the Secured Obligations.

90.     Defendant R. Osborne and Smith's sales were not part of any ordinary or regular pattern and their timing ins highly suspicious given that after news of the 2013 Order was widely disseminated on financial websites on November 22, 2013, in a single day shares of EGAS declined $0.89 per share, 9.64%, to close on November 25, 2013 at $8.34 per share on unusually heavy volume.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

91.     Plaintiff brings this action derivatively in the right and for the benefit of EGAS to redress injuries suffered, and to be suffered, by EGAS as a direct result of the breaches of the Individual Defendants' fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  EGAS is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

92.     Plaintiff will adequately and fairly represent the interests of EGAS and its shareholders in enforcing and prosecuting its rights.

93.     Plaintiff is the owner of EGAS common stock and was the owner of EGAS common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

94.     At the time that this action was commenced, the EGAS Board consisted of the following directors: Defendants R. Osborne, Smith, Argo, Victor, G. Osborne, Brooksby, Male and Greaves.

95.     As a result of the facts set forth herein, Plaintiff has not made any demand on the EGAS Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

a.     The Board of Directors lacks independence because they are entangled in a web of corporate interests built around Defendant R. Osborne.  As set forth in detail above, Defendant R. Osborne habitually stands to personally benefit as the sole trustee of the Osborne Trust, which is the majority shareholder of many of EGAS's subsidiaries, from the ways in which he controls EGAS's operations to the detriment of EGAS and its shareholders, and has surrounded himself with a complicit board that will aid him in his self-interested pursuits;

b.     Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

c.     The Company has admitted that Defendants R. Osborne and Smith are not independent directors pursuant to the requirements of the listing standards of the NYSE and the Director Independence categorical standards.   Specifically, the principal professional occupation of Defendants R. Osborne and Smith is their employment with the Company, pursuant to which they received significant compensation from the Company. Similarly, Defendant G. Osborne, is

the President of EGAS and likewise is not independent.  Additionally, Defendant G. Osborne is the son of Defendant R. Osborne, the CEO of the Company.  Under the Categorical Standards, G. Osborne is not independent since an immediate family member has been an employee of the Company in the last three years;

        d.      Defendant Smith's family members have worked for the Company and Defendant R. Osborne controlled entities.  According to WHISTLEBLOWER 1, Defendant Smith's daughters Samantha and Stephanie worked for the Company at various times and Defendant Smith's wife was hired in December 2011 as an accountant for Independence Oil, LLC an entity controlled by Defendant R. Osborne;

        e.      Defendant R. Osborne is the sole trustee of the Osborne Trust, the primary shareholder in Northeast and Orwell.  Additionally Defendant Osborne is the Chairman of the Board and Chief Executive Officer of JDOG, while Defendant Smith is a member of the Board of JDOG;

        f.      Defendants R. Osborne and Smith used their knowledge of non-public Company information to sell their Company stock at greatly inflated values during the Relevant Period;

        g.      Although the Company purports that Defendant Michael Victor is independent, according to WHISTLEBLOWER 1, his son-in-law was hired as the CIO for EGAS even though he didn't have the sufficient work background to perform the position;

        h.      Defendant Male previously served as Chairman and CEO of PVF Capital Corp, a NASDAQ traded bank holding company for Park View Federal Savings Bank and as such is not independent from Defendants R. Osborne or Smith who both have served as board members of PVF Capital;

i.      The Company engaged in transactions with entities for which Defendant Brooskby served as an executive officer or employee, most notably Energy West.  Thus, he is conflicted and cannot make an independent determination as to whether to sue himself;

j.       In addition, EGAS's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards.  These defendants are also interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options;

k.      The entire EGAS Board and senior management participated in the wrongs complained of herein.  For the reasons described herein, EGAS's directors are not disinterested or independent.  The results of the 2010 Audit were contained in the Company's Form 10-Q filed with the SEC on November 5, 2011, and were therefore well aware of PUCO's findings.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.  Each of the above referenced defendants breached the fiduciary duties owed to EGAS and its shareholders by aiding and abetting R. Osborne in his quest to control the Company and its operations to the detriment of shareholders.  Thus, the EGAS Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action;

l.      The purpose of EGAS's Audit Committee is to assist the Board in fulfilling its oversight responsibilities. Specifically, the Audit Committee is to assist the Board in overseeing: (1) the integrity of the Company's financial statements; (2) the Company's financial reporting process; (3) the systems of internal accounting and financial controls at the Company; (4) the independent auditor's qualifications and independence; (5) the performance of the Company's internal audit function and independent auditors;  and (6) the Company's compliance

with ethics policies and codes of conduct, the Company's compliance with legal and regulatory requirements, and the adequacy of the Company's response to material violations of securities laws or breaches of fiduciary duty made by outside corporate attorneys, employees or other parties.  As interested members of EGAS's Audit Committee, Defendants Brooksby, Male, and Victor do not stand in a position to independently act in the Company's best interests and are hopelessly conflicted.  Moreover, Plaintiff is informed and believes that the Company's auditors raised the issue with the Audit Committee of having to write down receivables in advance of the Company's 2012 10-K filing from Defendant R. Osborne's privately controlled entities and that the Audit Committee was complicit with the scheme devised to allow other subsidiaries at EGAS pay these receivables in exchange for credit memos from Defendant R. Osborne's private companies.  Thus, any demand upon them relating to R. Osborne's self-interested transactions would be futile;

      m.      Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile;

      n.      The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred, and participated in efforts to conceal or disguise those wrongs from EGAS's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

      o.      In order to bring this suit, all of EGAS's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

      p.      The acts complained of constitute violations of the fiduciary duties owed by EGAS's officers and directors and these acts are incapable of ratification;

q.      Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and EGAS to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

r.      EGAS has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for EGAS any part of the damages EGAS suffered and will suffer thereby;

s.      Moreover, Plaintiff has not made any demand on shareholders of EGAS to institute this action since demand would be a futile and useless act for the following additional reasons:  (1) EGAS is a publicly held company with over 10.4 million shares outstanding. Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses of phone numbers of shareholders.  Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified; and (2) the conduct complained of herein could not have been the product of good faith business judgment, and each of these directors faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected EGAS to substantial damages.  Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

**COUNT I**
**(Violations Of 14(A) Of The Exchange Act And Sec Regulations Derivative**
**Claim On Behalf Of The Company Against All Individual Defendants)**

96.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

97.     This claim is brought under Section 14 of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

98.     Section 14 of the Exchange Act prohibits the solicitation of any proxy in contravention to the rules promulgated thereunder.

99.     Rule 14a-9 provides that no proxy solicitation shall be made by means of any proxy statement or other communication containing "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false and misleading."

100.    The Individual Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders which were contained in the Company's Definitive Proxies which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reasons of the conduct alleged herein, each Director defendant violated Section 14(a) of the Exchange Act.  This information would have been material to the Company's shareholders in determining whether to elect or reelect directors to manage their Company.

101.    The Company has been damaged as a result of the material misrepresentation and omission contained in the Proxy Statements.

102.    Plaintiff, on behalf of the Company, thereby seeks to void the election of Director Defendants based upon the misleading and incomplete proxy materials.  The Court should require Defendants to distribute corrected disclosures and hold a new vote.

**COUNT II**
**(Against The Individual Defendants For Breach Of Fiduciary Duty)**

103.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

104.    The Individual Defendants owed a fiduciary duty to EGAS to manage the Company in accordance with its best interests, as well as the best interests of its shareholders. Additionally, by reason of their positions as directors, officers and controlling shareholders of EGAS, the Individual Defendants owed EGAS and its stockholders fiduciary duties of care, loyalty, candor, good faith and fair dealing.  As fiduciaries, to discharge these duties, the Individual Defendants were required to exercise prudent supervision over management, policies, practices, controls, and financial and corporate affairs of EGAS.

105.    The Individual Defendants, however, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of EGAS's internal controls and by allowing Defendant R. Osborne to engage in self-serving transactions such as the implementation of Licensing Agreement and the inflated compensation packages set forth above.

106.    Additionally, Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other insiders in a manner to benefit Defendants and to ensure their voting control over EGAS.  Defendants breached their fiduciary duties by entering into a series of transactions calculated to suppress the rights of shareholders, including transactions that failed to provide the Company with reasonable value and restricted the purchasing activities of other shareholders, as set forth above.   In taking these actions, Defendants lacked reasonable

grounds to believe that a threat to corporate policy and effectiveness exists, and their actions were thus unreasonable in relation to a nonexistent threat.

107. Each of Defendants' acts in causing or allowing R. Osborne to engage in the self-serving transactions set forth above and abdicating his or her oversight responsibilities to the Company have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment. Rather, their acts constituted a complete abdication of their duties as officers and/or directors of the Company.

**COUNT III**
**(Against Defendants R. Osborne And Smith For Insider Selling**
**And Misappropriation Of Corporate Information)**

108. Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein. During the term of the wrongdoing alleged herein, Defendants R. Osborne and Smith (the "Selling Defendants") occupied positions with the Company that made them privy to confidential, proprietary information concerning the Company's financial condition and future business prospects. The foregoing information was a proprietary asset belonging to the Company, which the Selling Defendants used for their own benefit and to the detriment of the Company and its shareholders. Notwithstanding their duty to refrain from trading in EGAS's common stock under the circumstances, the Selling Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company and what the findings would be of the 2013 PUCO Order.

109. The adverse, non-public material information regarding the Company's current and future earnings prospects was proprietary information belonging to the Company. In using their knowledge of the Company's undisclosed information to sell their personal holdings of EGAS common stock at inflated prices, the Selling Defendants used the Company's proprietary

information for their own benefit. Since the use of the Company's information for the Selling Defendants' own gain constitutes a breach of fiduciary duty, the Company is entitled to the imposition of a constructive trust on any profits the Selling Defendants received from their insider sales.

110.    As a result of their misconduct, the Selling Defendants are liable to the Company.

### COUNT IV
### (Against The Individual Defendants For Gross Mismanagement)

111.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

112.    Defendants had a duty to EGAS and its shareholders to prudently supervise, manage and control the operations, business, and internal financial accounting and disclosures of the Company.  Defendants, however, by their actions and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of EGAS in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of EGAS's affairs and in the use and preservation of the Company's assets.

113.    During the course of the discharge of their duties, Defendants were aware of the unreasonable risks and losses associated with their misconduct.   Nevertheless, Defendants caused EGAS to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.   As a result, Defendants grossly mismanaged EGAS, thereby causing damage to the Company.

### COUNT V
### (Against The Individual Defendants For Contribution And Indemnification)

114.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

115.     EGAS is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to Defendants' liability to the Company.

116.     EGAS's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of Defendants, and the Company is entitled to contribution and indemnification from each defendant in connection with all such claims that have been, are, or may in the future be asserted against EGAS, by virtue of the Individual Defendants' misconduct.

## COUNT VI
### (Against The Individual Defendants For Abuse Of Control)

117.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

118.     The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over EGAS.

119.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT VII
### (Against The Individual Defendants For
### Waste Of Corporate Assets)

120.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

121.    The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of EGAS.

122.    As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

1.      For an Order declaring the December 13, 2012 shareholder vote on the election of EGAS's directors null and void;

2.      For an Order rescinding the Company's purchase of JDOG;

3.      For the imposition of a constructive trust in favor of the Company for the amounts of profits each of the insider selling defendants received from their sales of EGAS's common stock;

4.      For damages against and/or restitution from Defendants in an amount to be proven at trial;

5.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

6.      Directing EGAS to take all necessary actions to reform and improve its corporate governance and internal control procedures so that they comply with relevant laws and prohibit and prevent any Individual Defendant, including, but not limited to Defendant R. Osborne, from engaging in self-interested transactions to the detriment of the Company and its shareholders;

7.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

8.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: December 10, 2013                    **STRAUSS TROY**

                                            /s/ Richard S. Wayne
                                            Richard S. Wayne (Attorney Bar No. 0022390)
                                            Thomas P. Glass
                                            Thomas P. Glass (Attorney Bar No. 0062382)
                                            150 East Fourth Street
                                            Cincinnati, OH 45202-4018
                                            Telephone: (513) 621-2120
                                            Facsimile: (513) 629-9426


OF COUNSEL:

**GLANCY BINKOW
   & GOLDBERG LLP**
Lionel Z. Glancy
Robert V. Prongay
Louis N. Boyarsky
Leanne Heine
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**LAW OFFICES OF HOWARD G.
SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

3533990_1.doc

# VERIFICATION

I, Richard J. Wickham, hereby verify and declare that I have reviewed the Shareholder Derivative Complaint ("Complaint") in this action. The allegations contained within the Complaint are true and correct to the best of my knowledge, information, and belief, and I have authorized the filing of this Complaint. I also hereby verify and declare that I am, and at all relevant times was, a shareholder of the Company.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:      November _30_, 2013

_Richard J Wickham_
Richard J. Wickham